UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
EARL T. SYDNEY &                            )
SYDNEY SHEET METAL, INC.,                   )
                                            )
            Plaintiffs,                     )
                                            )
v.                                          )        Civil Action No. 15-10786-LTS
                                            )
SHEET METAL WORKERS'                        )
PENSION FUND,                               )
                                            )
            Defendant.                      )
_____)

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOCS. 52, 54)

February 7, 2017

SOROKIN, J.

        For years, Defendant Sheet Metal Workers' National Pension Fund ("Fund"), a

multiemployer pension plan, sent Plaintiff Earl T. Sydney statements showing that he was

accruing pension credits, presumably based on contributions that his company, Sydney Sheet

Metal, Inc. ("SSM"), made to the Fund.  Under the plan's provisions, however, the statements

were wrong, and Mr. Sydney was not accruing those credits.  The Fund only informed Mr.

Sydney of its error after he suffered a stroke and requested his pension.  Plaintiffs ask the Court

to order the Fund to give Mr. Sydney the credits that he was told he was accruing or, in the

alternative, to return money that SSM contributed to the Fund.  The Court sympathizes with

Plaintiffs' situation, but there is no remedy available under the Employee Retirement Income

Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, or under federal common law.  Thus, the Court

ALLOWS Defendant's Motion for Summary Judgment (Doc. 52) and DENIES Plaintiffs'

Motion for Summary Judgment (Doc. 54).


I.     STATEMENT OF FACTS[1]

    A.     Plaintiffs' Union Membership and the Union's Contribution Requirements

    Starting in 1983, Mr. Sydney worked for one or more employers who were parties to

collective bargaining agreements (CBAs) with Sheet Metal Workers Local Union 17 ("Local

17"), which is part of the Sheet Metal Workers' International Association.  Doc. 50 at 38.  On

June 1, 2001, however, Mr. Sydney formed and incorporated his own company, SSM.  Id. at 3,

38.

    On September 1, 2001, December 24, 2002, and April 7, 2003, Mr. Sydney, on behalf of

SSM, signed CBAs with Local 17.  Id. at 39.  Under those CBAs, Mr. Sydney was considered an

"Owner-Member," as he owned SSM and was a member of Local 17.  Id.  Mr. Sydney was an

Owner-Member of Local 17 from September 1, 2001, until June 2014.  Id. at 2, 39.

    Each CBA stated that "[c]ontributions on behalf of Owner/Members shall be made to the

[Fund] for all hours for which the Owner/Member is paid or entitled to payment."  Id. at 40

(quoting AR at 570).

    Each CBA further stated:

        Contributions to all funds [including the Fund] shall be made by or on
        behalf of any person who is an Owner-Member . . . on the basis of 40

---

Typically, in considering cross-motions for summary judgment, the Court must "consider each motion separately, drawing all [factual] inferences in favor of each non-moving party in turn."  D & H Therapy Assoc. LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011) (citation omitted).  In cases "that concern benefit determinations under an ERISA plan, however, . . . summary judgment is simply a vehicle for deciding the issue and the non-moving party is not entitled to the usual inferences in its favor."  Id. (citations and internal quotation marks omitted). In this section, all of the factual assertions are (1) undisputed by the parties; (2) verified by the Court using the Administrative Record ("AR"); or (3) where disputed and unverified, prefaced by "Plaintiffs allege" or "Defendant alleges."  (While the disputed and unverified assertions deserve mention, none of them is material to the Court's ultimate decision.)

> hours per week, payable monthly, plus actual hours in excess of forty (40). If such contributions are not timely paid by or on behalf of the Owner-Member, he shall be terminated from all participation in the funds . . . .

Id. at 39-40; see also Doc. 21-2 at 25.


B.    The Fund's Former Registration Requirement

Before January 1, 2002, contributing employers to the Fund which employed Owner-Members needed to file a Registration Statement with the Fund to ensure that the Owner-Members received pension credit for hours worked.  See AR at 586.  Effective January 1, 2002, however, Owner-Members no longer needed to file Registration Statements to receive pension credit.  Id.

On August 5, 2002, the Fund informed SSM that although the company reported hours worked by an Owner-Member (i.e., Mr. Sydney) before January 1, 2002, it had not filed a Registration Statement, so Mr. Sydney was at risk of losing pension credit for hours he worked before January 1, 2002.  Id.  The Fund "strongly urged" SSM to file a Registration Statement. Id.

On or about December 30, 2002, SSM filed an Owner-Member Registration Statement with the Fund.  Doc. 50 at 5.  Mr. Sydney later told the Fund that the only reason he became an Owner-Member was to actively participate in the Fund's retirement plan.  Id.

On June 13, 2003, the Fund issued a letter approving Mr. Sydney's Owner-Member Registration Statement retroactively to August 1, 2001.  Id.  Thus, Mr. Sydney received pension credit for hours he worked from August 1, 2001, until January 1, 2002, when the Fund no longer required Owner-Members to file a Registration Statement in order to participate in the Fund.

The Fund's letter stated: "Effective January 1, 2002 contributions for all Owner/Members are due in accordance to your collective bargaining agreement with [Local 17]." AR at 584.

C.     The Fund's Contribution Requirements

Effective January 1, 2002, Section 1.13(d) of the Fund's Plan Document stated:

> If a Contributing Employer [i.e., SSM] employing an Owner-Member fails to make contributions to the [Fund] with respect to any Covered Employee,[2] including the Owner-Member, the Owner-Member shall cease to be a Covered Employee [i.e., will cease to receive pension credits] as of the first day of the month that follows the due date of the unpaid contribution.  In such case, the Owner-Member shall become a Covered Employee again when the Contributing Employer resumes making timely contributions to the [Fund] on behalf of all its Covered Employees, including the Owner-Member; provided, however, that the Owner-Member shall not be in Covered Employment for the one-year period commencing on the date of such resumption.

Doc. 50 at 47-48.

In an August 5, 2002, letter to SSM, the Fund summarized Section 1.13(d), stating: "You should . . . be aware that if your company becomes delinquent [in making contributions to the Fund], your Owner/Members will not receive Pension Credit until the delinquency is resolved and until 12 months of timely contributions have been made on behalf of all Covered Employees, including the Owner/Members." Id. at 52 (citing AR at 587).  According to the Fund's Director of Operations, Debbie Elkins, the purpose of Section 1.13(d) was to prevent Owner-Members from being "able to benefit from their companies' participation in the [Fund] if their companies were not making contributions on time, . . . which impaired the [Fund's] funded status." Id. at 11.

---

[2] On January 1, 2002, Mr. Sydney was a Covered Employee and in Covered Employment.  Doc. 50 at 50.

In 2008, the Fund included a description of Section 1.13(d) in its Summary Plan Description.  Id. at 14; AR at 7.

From July 2010 through August 2014, the Fund sent multiple delinquency notices to SSM; those notices summarized Section 1.13(d)'s consequences for Owner-Members of delinquent Contributing Employers.  See AR at 594-643.

In May 2013, Section 1.13(d) was amended to state:

> If a Contributing Employer employing an Owner-Member fails to make contributions to the [Fund] with respect to any Covered Employee,[3] including the Owner-Member, the Owner-Member shall cease to be a Covered Employee as of the first day of the month that follows the due date of the unpaid contribution.  *With respect to any delinquency identified by the [Fund] after May 1, 2013, the preceding sentence shall apply only if the Contributing Employer knowingly failed to make contributions to the [Fund] with respect to any Covered Employee.*  In such case, the Owner-Member shall become a Covered Employee again when the Contributing Employer resumes making timely contributions to the [Fund] on behalf of all its Covered Employees, including the Owner-Member; provided, however, that the Owner-Member shall not be in Covered Employment for the one-year period commencing on the date of such resumption.

AR at 482-83 (italics in original to show amendment); see also id. at 657.  This amendment "was intended to take account of situations where a Contributing Employer made an honest mistake."  Id. at 483.

D.      SSM's Delinquency and the Fund's Collection Litigation

From February 2006 to January 2011, SSM failed to make timely contributions to the Fund and failed to cure by making a full continuous year of timely contributions.  AR at 8, 43.  In 2011, the Fund filed suit against SSM to collect delinquent contributions, a "substantial portion" of which related to contributions on behalf of Mr. Sydney.  Doc. 50 at 9.  On November

---

[3] It is undisputed that on January 1, 2002, Mr. Sydney was a Covered Employee and in Covered Employment.  Doc. 50 at 50.

9, 2011, Mr. Sydney, in his capacity as Owner/President of SSM, signed a settlement agreement

with the Fund, in which he agreed to contribute to the Fund. Doc. 21-1 at 4. Plaintiffs allege,

without citation to any supporting evidence, that Mr. Sydney signed the settlement agreement

before the Fund informed him or SSM that contributions made on his behalf since April 30,

2006, and as part of the settlement agreement "would not inure to [his] benefit." Doc. 50 at 26-

27.

On March 13, 2014, the Fund filed an Amended Complaint against SSM to collect

delinquent contributions, a "substantial portion" of which related to contributions on behalf of

Mr. Sydney as an Owner-Member and Covered Employee. Id. at 9; Doc. 27 at 10. On July 17,

2014, Mr. Sydney, on behalf of SSM, signed another settlement agreement, covering collection

of delinquent contributions from July 1, 2011, through May 31, 2014. Doc. 50 at 30. Section 12

of the settlement agreement stated:

> Notwithstanding anything to the contrary contained herein, nothing in this
> [agreement] shall modify, amend, or alter any provision of any document
> governing the payment of benefits by the [Fund], including, but not
> limited to, any provision pertaining to or governing: Covered
> Employment (including, but not limited to, any rules pertaining to an
> Owner-Member's status as a Covered Employee), the accrual of benefits
> or crediting of service, participation in the Plan as a Contributing
> Employer or a Participant, credited service, and eligibility for benefits.

Id. Plaintiffs allege that the language in Section 12 "was not in earlier versions of the settlement

agreements prepared by the [Fund] and signed by [SSM]." Id.; see also Doc. 21-1.


E.      The Fund's Failure to Timely Recognize SSM's Delinquency

Because of SSM's delinquency in contributing to the Fund from February 2006 to

January 2011, under Section 1.13(d), Mr. Sydney was not receiving pension credit during that

entire period. However, the Fund issued statements to Mr. Sydney incorrectly reporting

otherwise.  See, e.g., Doc. 50 at 18-19 (citing annual pension credit statements from 2007 and 2008).

Indeed, until March 2013, the Fund failed to identify Mr. Sydney as the Owner-Member of a delinquent Contributing Employer.  See AR at 3506.  That month, the Fund corrected the amount of pension credit Mr. Sydney had to reflect the period in which he was not a Covered Employee due to SSM's delinquency, per Section 1.13(d).  Id.  But even then, the Fund failed to actually notify Mr. Sydney of the pension credit correction.  Ms. Elkins prepared a letter in March 2013 to inform Mr. Sydney about the "updating of his benefits records."  Id.  However, "the letter did not go out," unbeknownst to her.  Id.

In 2014, after suffering a stroke and being hospitalized, Mr. Sydney applied for benefits. Id. at 16, 3506.  When he did, Ms. Elkins realized that her March 2013 letter had not been sent to Mr. Sydney.  Id. at 3506.  On March 25, 2014, Ms. Elkins sent Mr. Sydney a letter serving "notice" that, pursuant to Section 1.13(d), because SSM had "failed to make timely contributions to the Fund . . . since April 2006," the hours he worked since that month did not "result in any Pension Credit."  Id. at 13.  Were it not for Section 1.13(d), Mr. Sydney would receive a monthly pension benefit payment of $3,761, not $2,663.  Doc. 50 at 22.

F.       The Fund's Failure to Timely Recognize Delinquent Contributions by Other
         Owner-Members' Companies

Prior to 2013, there was no formal process for screening the over 50,000 participants in the Fund to identify Owner-Members who were associated with delinquent Contributing Employers, and who therefore ceased to be Covered Employees by operation of Section 1.13(d). AR at 480.  Such Owner-Members came to the attention of the Fund incidentally, such as through "the litigation process to collect delinquent contributions, [and] in connection with the

[Owner-Members'] application for benefits." Id. Once Owner-Members associated with delinquent Contributing Employers came to the Fund's attention, those Owner-Members' pension records would be updated to reflect when they ceased to be Covered Employees under Section 1.13(d), i.e., when they ceased to receive pension credit. Id.; see also id. at 523.

Plaintiff, citing over 2,300 pages of the Administrative Record, alleges that, on average, there was a five-year delay between the date an Owner-Member of a delinquent Contributing Employer ceased to be a Covered Employee under Section 1.13(d) and the date the Owner-Member was notified of the cessation.[4] Doc. 50 at 17-18.

According to a letter dated August 14, 2015, the Fund's staff "currently . . . endeavors to identify any Owner-Members associated with a delinquent Contributing Employer when the matter is referred to litigation counsel for collection of the delinquent contributions." AR at 524. The Fund stated that it "would be unduly burdensome for our staff to review the records of all Employers who have been delinquent with their contributions at any time since Section 1.13(d) became effective on January 1, 2002, to identify any such Owner-Members who have not already been identified using the procedures currently in place." Id.

G.      Mr. Sydney's Appeal of the Application of Section 1.13(d)

By letter dated September 8, 2014, Mr. Sydney appealed the application of Section 1.13(d) to the Trustees of the Fund's Appeals Committee. Id. at 24. Under Section 8.03 of the Plan Document, the Appeals Committee has "the sole and absolute power, authority and discretion to determine" the "application and interpretation of the Plan Document," the

---

[4] Defendant denies that this assertion is supported by the citations to the AR. Doc. 50 at 18.

"entitlement to or amount of a pension," and "the crediting of . . . Contribution Hours." Doc. 50 at 60 (quoting AR at 727).

In his letter to the Appeals Committee, Mr. Sydney stated that he "was never given notice that the pension fund hours that were paid by [SSM] were not being credited to Mr. Sydney's pension plan." AR at 16. He stated that the annual statements that he received from the Fund "led him to believe" that he was accruing pension credits. Id. He further stated that, if he had been notified in 2006 that SSM's contributions on his behalf were not being credited due to untimeliness, "he would have taken other steps concerning his pension plan," as "[t]he only reason for being an Owner-Member . . . was to actively participate in the retirement plan [i.e., the Fund's pension plan]." Id. Mr. Sydney concluded that "his hours from 2006 to 2012 that were paid in full [should] be properly recognized" given the "lack of prior proper notification on this matter." Id. at 17.

On December 15, 2014, the Fund's Appeals Committee denied the appeal, concluding that Section 1.13(d) had been applied appropriately. AR at 7. The Appeals Committee reasoned that Mr. Sydney had adequate notice of Section 1.13(d), given that (1) the Fund had not been "legally required to send special notice" of existing plan provisions such as Section 1.13(d); (2) the Fund's 2008 Summary Plan Description described Section 1.13(d); and (3) the Fund directly advised SSM of the consequences of contribution delinquency under Section 1.13(d). Id. at 3-4. The Fund also noted that there was no dispute that SSM had been delinquent in making timely contributions during the relevant period, and that the Fund's Plan Document "did not offer any exception to" Section 1.13(d). Id. at 3, 7.

H.    SSM's Demand for the Fund to Refund Contributions

Plaintiffs allege that after April 30, 2006, SSM contributed over $115,000 to the Fund on behalf of Mr. Sydney.  Doc. 50 at 7; Doc. 55 at 12.  In some months, SSM made contributions to the Fund only for Mr. Sydney as an Owner-Member, whereas in other months SSM also made contributions for other members of Local 17 who performed services for SSM.  Doc. 50 at 7-8.

The Fund's procedures provide for the refund of contributions under certain circumstances as permitted by ERISA.  Id. at 31.  By letter dated April 14, 2015, Plaintiffs' counsel submitted a request to the Contributions Committee of the Fund's Board of Trustees to refund SSM's contributions made after April 2006, on the ground that the contributions were erroneous.  Id. at 32.  The Contributions Committee had the authority to "determine whether or not Contributions are erroneous, and the circumstances under which a refund of erroneous contributions may be made."  AR at 3372-73.  Under Section VI of the Fund's Procedures for the Collection of Contributions, the term "erroneous contributions" means contributions an Employer made to the Fund, by a mistake of fact or law, "in excess of the amount an Employer owes."  Id. at 3382.

In the April 14, 2015, letter Plaintiffs' counsel explained that if SSM "had understood that the Fund would . . . retroactively apply" Section 1.13(d) to Mr. Sydney, SSM "would have stopped contributing to the Fund on behalf of Mr. Sydney starting on April 6, 2006."  Id. at 33.  Plaintiffs' counsel stated that SSM had "made a mistake in continuing to make contributions on Mr. Sydney's behalf when he could not benefit from those contributions," but that it was unaware of the mistake "until March 2014, when the Fund notified Mr. Sydney that his service credit was forfeited retroactive to April 6, 2006."  Id.  Plaintiffs' counsel faulted the Fund for its behavior in its collection litigation, specifically for "induc[ing]" SSM, which did not have "the

assistance of legal counsel" at the time, to "execute a settlement agreement"[5] with in response to the Fund's collection litigation without first informing SSM that Mr. Sydney (1) "would not have any service credit retroactive to April 6, 2006," and (2) "could not benefit from the contributions that [SSM] was compelled to pay on his behalf under the settlement agreement." Id.

On July 23, 2015, SSM submitted a supplemental letter to the Contributions Committee, stating: "From January 22, 2003 until October 1, 2013 (with a notable exception with regard to Sydney Sheetmetal), the Fund expressly characterized contributions made on behalf of Owner-Members who were denied pension benefits attributable to these contributions as 'erroneous contributions' and offered to refund these erroneous contributions to the Contributing Employer." Id. at 34-35 (citing various refund offers to other Contributing Employers, available at AR at 3413-417).

By letter dated September 17, 2015, the Fund announced that the Contributions Committee denied SSM's refund request. Id. at 35-36. The Contributions Committee "noted its understanding that, under ERISA, the Internal Revenue Code and the [Fund's] own written collection procedures, a refund of contributions may be made only where the Contributing Employer can establish that the contributions were made by mistake of fact or law." AR at 3488. The Contributions Committee "concluded that there was no mistake of fact or law in the present circumstances," given that SSM, through Mr. Sydney, signed two CBAs – on September 1, 2001, and on April 7, 2003 – both of which contained a provision that "required [SSM] to make contributions for its Owner-Member, Earl Sydney, on the basis of at least 40 hours per week (regardless of whether he performed work[] covered by the Fund), and which also stated

---

[5] It is not clear to the Court whether the letter's reference to "a settlement agreement" is erroneous, given that SSM actually entered into two settlement agreements, or if Plaintiffs' counsel actually intended to complain about only one of the settlement agreements. This lack of clarity is irrelevant for purposes of this Order.

explicitly that if [SSM] did not timely make those contributions, Earl Sydney would be terminated from participation in the Fund." Id. at 3486. "Therefore," the Contributions Committee stated, SSM "could not reasonably claim that it did not know [it] would be required to make contributions on account of Earl Sydney's status as an Owner-Member under the CBAs even though[] he would not be accruing benefits under the Fund after [SSM] became delinquent." Id.

The Contributions Committee distinguished the refund offers to Contributing Employers that SSM cited in its July 23, 2015, letter, stating that the situations in which those offers were made "were quite different from" SSM's situation. Id. at 3489. In those situations, the Contributions Committee stated, "the Contributing Employers made contributions in the mistaken belief that a particular employee or group of employees was covered under a registration statement or participation agreement that formerly required contributions" to the Fund, "when in fact those persons were not covered," rendering the contributions erroneous. Id. In SSM's situation, however, it was "undisputed that Mr. Sydney was an Owner-Member within the meaning of the CBAs, and the CBAs . . . contained an independent requirement (separate and apart from the Owner-Member provisions of the [Fund's] Plan Document) that contributions be made by or on behalf of Owner-Members as defined in the CBAs." Id. Thus, SSM was not mistaken that it needed to make contributions on behalf of Mr. Sydney, and the Fund could not refund those contributions. Id.

I.      The Instant Action

On March 11, 2015, Plaintiffs initiated this action, alleging Defendant violated ERISA and federal common law. Doc. 1. On October 29, 2015, Plaintiffs filed the operative Amended

Complaint. Doc. 21. Plaintiffs' three-count Amended Complaint alleges that (1) Defendant

unlawfully denied Mr. Sydney pension credits he had earned; (2) after the denial, Defendant

unlawfully failed to refund SSM's contributions to the Fund on behalf of Mr. Sydney; and (3)

Plaintiffs are entitled to attorney's fees and costs. Id. at 11-14.

On May 17, 2016, Plaintiffs and Defendant filed the instant Motions for Summary

Judgment. Docs. 52, 54. Each party seeks judgment in its favor on all three counts in the

Amended Complaint. On June 27, 2016, each party filed an Opposition to the other's Motion for

Summary Judgment. Docs. 56, 57.

## II.     COUNT ONE:  MR. SYDNEY'S DEMAND FOR PENSION CREDITS

Plaintiffs ask the Court to overturn the Appeals Committee's decision that the Fund

applied Section 1.13(d) appropriately, and to order the Fund to give Mr. Sydney "the benefits to

which [he] is entitled without regard to Section 1.13(d)." Doc. 55 at 20. They essentially make

the following arguments:  (1) the Court should engage in *de novo* review of the Appeals

Committee's decision, id. at 5, 7; (2) the Appeals Committee incorrectly found that Section

1.13(d) applied "automatically" and without "exception," rather than "selectively" and in the

Fund's "discretion," id. at 8, 9 n.6, 13, 18; (3) the Fund's application of Section 1.13(d) violates

ERISA Section 204(g),[6] id. at 8; (4) the Fund improperly failed to "issue a notice pursuant to

ERISA Section 204(h)[7] prior to applying Section 1.13(d)," id.; and (5) in the alternative, if the

Court does not find that the Fund violated Section 204(g) or 204(h), Mr. Sydney is entitled to the

---

[6] Section 204(g) prohibits the decrease by amendment of any accrued benefit of a participant in an ERISA plan.
Bonneau v. Plumbers and Pipefitters Local Union 51 Pension Trust Fund ex rel. Bolton, 736 F.3d 33, 36 (1st Cir.
2013).
[7] Section 204(h) prohibits a plan administrator from "amend[ing] a plan so as to significantly reduce the rate of
future benefit accrual unless it provides notice to the plan participants." Gillis v. SPX Corp. Individual Account
Retirement Plan, 511 F.3d 58, 63 (1st Cir. 2007) (citing 29 U.S.C. § 1054(h)(1)).

benefits he seeks "through the equitable reformation remedy available under ERISA § 502(a)(3),"[8] id. at 22. As the Court will explain, none of these arguments has legal merit.

A.      Standard of Review

Plaintiffs argue that the Court should review the Appeals Committee's decision *de novo*. The Court rejects this argument, and will instead review the decision for abuse of discretion.

Courts "generally review the denial of benefits under an ERISA plan *de novo*." Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014) (citations omitted). "However, where the plan grants the plan administrator or another fiduciary the discretionary authority to construe the terms of the plan or to determine a participant's eligibility for benefits, courts apply a deferential standard of review, upholding the administrator's decision unless it is arbitrary, capricious, or an abuse of discretion." Id. (citations and internal quotation marks omitted). "Deference promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation." Conkright v. Frommert, 559 U.S. 506, 517 (2010).

In this case, under Section 8.03 of the Plan Document, the Appeals Committee has "the sole and absolute power, authority and discretion to determine" the "application and interpretation of the Plan Document," the "entitlement to or amount of a pension," and "the crediting of . . . Contribution Hours." Doc. 50 at 60. Because the Appeals Committee, as plan administrator, has discretionary authority to construe the Plan Document and to determine eligibility for benefits, the Court must uphold the Appeals Committee's decision unless it was

---

[8] Section 502(a)(3) authorizes a plan participate to bring a civil action to obtain "appropriate equitable relief" to redress a violation of ERISA or to "enforce any provisions of [ERISA] or the terms of the plan." Mertens v. Hewitt Associates, 508 U.S. 248, 253 (1993) (quoting 29 U.S.C. § 1132(a)(3)) (internal quotation marks omitted).

arbitrary, capricious, or an abuse of discretion.  Ortega-Candelaria, 755 F.3d at 20.  "[T]he question is not which side [the Court] believe[s] is right," but whether the administrator's decision was "reasonable" and supported by "substantial evidence," i.e., evidence that "is reasonably sufficient to support" the decision.  Id. (citations and internal quotation marks omitted).  "[S]o long as substantial evidence supports the plan administrator's decision, the decision is not rendered unreasonable by the mere existence of evidence to the contrary."  Id. (citations and internal quotation marks omitted).

Plaintiffs argue that the Court should review the Appeals Committee's ruling *de novo* because the question before the Court – namely, "whether the Fund was required to issue a notice to Mr. Sydney under ERISA § 204(h) prior to 'adjusting' its records to retroactively revoke" pension credits – is "strictly a legal question."  Doc. 55 at 5, 7; Doc. 56 at 2.  This argument fails, as even Plaintiffs acknowledge that the Appeals Committee's decision relied heavily on the Committee's construction of Section 1.13(d) of the Plan Document.  See, e.g., Doc. 55 at 8 (stating that the Appeals Committee "erroneously relied upon" its interpretation that "Section 1.13(d) operates automatically" to find that Section "204(g) is not implicated and no Section 204(h) Notice was required").  Thus, the standard-of-review rule articulated in Ortega-Candelaria applies here.

Plaintiffs also argue that, to the extent "any deference may be due [to] the Fund's interpretation of the Plan [D]ocument," the "Court must temper" its deference "due to the potential for conflict of interest of the trustees," given that the Fund "'both evaluates claims for benefits and pays benefit claims.'"  Doc. 55 at 6 (quoting Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 110 (2008)).  Assuming such a conflict exists, Plaintiffs have not satisfied their "burden of showing that the conflict influenced [the Fund's] decision," by, for example,

challenging the Fund's "internal procedures to insulate the review process from the conflict." Cusson v. Liberty Life Assur. Co. of Boston, 592 F.3d 215, 225 (1st Cir. 2010) (citation omitted), abrogated on other grounds by Montanile v. Bd. of Trustees of Nat. Elevator Industry Health Benefit Plan, 136 S. Ct. 651, 656 (2016). Moreover, "the presence of a conflict of interest does not alter the [abuse-of-discretion] standard of review, but rather is 'but one factor among many that a reviewing judge must take into account,'" which may "'act as a tiebreaker when the other factors are closely balanced.'" Ortega-Candelaria, 755 F.3d at 27 (quoting Glenn, 554 U.S. at 116); Denmark v. Liberty Life Assur. Co. of Boston, 566 F.3d 1, 9 (1st Cir. 2009) (quoting Glenn, 554 U.S. at 117). As the Court will show, the factors in this case are not closely balanced because Defendant's reasons for denying Plaintiffs' claims are sound. Thus, under any standard of review – and certainly under an abuse-of-discretion standard, notwithstanding the consideration of a potential conflict of interest – Defendant would be entitled to summary judgment.

B.     The Appeals Committee's Construction of Section 1.13(d)

Plaintiffs argue that the Fund's Appeals Committee erroneously interpreted Section 1.13(d) as applying without "exception" and, thus, "automatically." AR at 7; Doc. 55 at 8. Plaintiffs contend that the Appeals Committee should have held that the Fund applied Section 1.13(d) "selectively," using its "discretion." Doc. 55 at 9 n.6, 13. This dispute over the construction of Section 1.13(d) is, in fact, the crux of the parties' dispute: according to Plaintiffs, in 2013 the Fund "selectively" applied Section 1.13(d) to improperly "revoke" pension credits that Mr. Sydney had "earned" since April 2006. Id. at 1, 7, 13. Conversely, according to Defendant, in 2013 the Fund merely "rectif[ied]" its pension records to reflect that, pursuant to

the "automatic" application of Section 1.13(d), Mr. Sydney stopped earning pension credits in April 2006 due to SSM's delinquency in contributing to the Fund and its subsequent failure to cure. Doc. 53 at 24; Doc. 57 at 11.

The Court finds that the Appeals Committee's construction of Section 1.13(d) is valid under any standard of review, and particularly under an abuse-of-discretion standard. The "plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." Colby v. Union Sec. Ins. Co. & Management Co. for Merrimack Anesthesia Associates Long Term Disability Plan, 705 F.3d 58, 65 (1st Cir. 2013) (citation and internal quotation marks omitted). Here, the plain language of Section 1.13(d) supports the Fund's determination that the Section operates automatically and without exceptions. The Section plainly states that an Owner-Member, such as Mr. Sydney, "*shall* cease to be a Covered Employee" and receive pension credits on "the first day of the month that follows the due date of [an] unpaid contribution" to the Fund by a Contributing Employer, such as SSM, and that the Owner-Member "*shall not* be in Covered Employment again" until the Contributing Employer makes timely contributions for a "one-year period." Doc. 50 at 47-48 (emphases added); see also id. at 52 (noting that an August 5, 2002, letter from the Fund to SSM stated that "if your company becomes delinquent, your Owner/Members *will not* receive Pension Credit until the delinquency is resolved and until 12 months of timely contributions have been made") (emphasis added). The Fund used "shall" and "will," rather than a word like "may," to explain the consequences of contribution delinquency under Section 1.13(d). The term "shall" is naturally understood to mean that something is "mandatory," rather than discretionary. Barnhart v. Peabody Coal Co., 537 U.S. 149, 158 (2003). A consequence that is "mandatory" is naturally understood to be "automatic." See, e.g., Woodson v. North Carolina, 428 U.S. 280, 296 (1976). Thus, there is no

reason to find that the Appeals Committee abused its discretion in interpreting Section 1.13(d)'s application as automatic and without exceptions – particularly given that Plaintiffs do not claim that some other provision in the Plan Document creates an exception to Section 1.13(d).

Plaintiffs argue that, if Section 1.13(d) actually operated "automatically," the Fund would not have had to "adjust[]" Mr. Sydney's pension records in March 2013. Doc. 55 at 13-14. It is far more likely, however, that, until 2013 – the year that the Fund finally instituted a formal process for identifying Owner-Members of delinquent Contributing Employers – the Fund simply failed to identify Mr. Sydney as such an Owner-Member, as Debbie Elkins, the Fund's Director of Operations, stated. See supra Sections I.E, I.F. Given the institution of the identification process for Owner-Members of delinquent employers in 2013, and given the plain language of Section 1.13(d), the Court finds that the Fund's adjustment of Mr. Sydney's pension records in March 2013 amounted not to a discretionary application of Section 1.13(d), but to a correction of Mr. Sydney's records to account for the years when SSM was delinquent in making timely contributions.

For the foregoing reasons, under any standard of review, and particularly under an abuse-of-discretion standard, the Appeals Committee's construction of Section 1.13(d) as automatic and without exceptions is valid. The Court therefore agrees with Defendant that, pursuant to Section 1.13(d), Mr. Sydney automatically stopped earning pension credits in April 2006 due to SSM's delinquency and subsequent failure to cure.

C.      Whether the Fund's Actions Violated Section 204(g)

Plaintiffs argue that Defendant violated ERISA Section 204(g) by adjusting Mr. Sydney's pension records in March 2013 to account for the years that SSM was delinquent in contributing to the Fund. See Doc. 55 at 8. The Court rejects this argument. Section 204(g), also known as

ERISA's anti-cutback rule, "prohibits the decrease by amendment of any accrued benefit of a participant in an ERISA plan." Bonneau, 736 F.3d at 36 (citing, *inter alia*, 29 U.S.C. § 1054(g)(1)) (citations, internal quotation marks, and alterations omitted). Section 204(g) seeks to ensure that if a worker "has fulfilled whatever conditions are required to obtain" an accrued benefit, "he actually will receive it." Id. (citations and internal quotation marks omitted). ERISA "rather circularly defines 'accrued benefit' as 'the individual's accrued benefit determined under the plan.'" Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 744 (quoting 29 U.S.C. § 1002(23)(A)). This definition is "nothing more than a signpost directing [the Court] to look to the terms of the plan at issue." Bonneau, 736 F.3d at 38 (citation and internal quotation marks omitted).

Under Section 1.13(d), Mr. Sydney stopped accruing pension credits in April 2006. See supra Section II.B. Therefore, in March 2013, the Fund did not "decrease by amendment" any accrued benefit (i.e., any accrued pension credits). Rather, the Fund merely corrected its records to account for the years that Mr. Sydney failed to accrue pension credits because his company was delinquent and thus failed to "fulfill[] whatever conditions [were] necessary to obtain" the credits. Id. at 36. In other words, Mr. Sydney never actually accrued the pension credits that he now claims the Fund decreased. Thus, Section 204(g) does not apply.

D.      Whether the Fund Violated Section 204(h)

Plaintiffs argue that the Appeals Committee erred in concluding that the Fund was not "required to issue a notice pursuant to ERISA Section 204(h) prior to applying Section 1.13(d)." Doc. 55 at 8; see also id. at 10. The Court rejects this argument and finds that Section 204(h) notice was not required in 2013.

Section 204(h) requires a pension plan administrator to provide notice to plan participants before the effective date of a plan amendment that significantly reduces the rate of future benefit accrual. Gillis, 511 F.3d at 63; 29 U.S.C. § 1054(h)(1)-(3). When the Fund adjusted Mr. Sydney's pension records in March 2013, it did not amend the Plan Document to reduce the rate of his future benefit accrual. Rather, the Fund merely corrected the amount of pension credits that it had estimated Mr. Sydney had previously accrued. Thus, Section 204(h)'s notice requirement is inapplicable in this case to these actions. Indeed, in various other cases with facts similar to this case – i.e., cases in which a plan mistakenly told a participant he had accrued more pension credits than he actually had, only to later issue a correction – courts have analyzed whether the correction was valid under principles of equitable estoppel, without any mention of Section 204(h). See, e.g., Mello v. Sara Lee Corp., 431 F.3d 440 (5th Cir. 2005) (cited as support for the First Circuit's decision in Livick v. The Gillette Co., 524 F.3d 24, 32 (1st Cir. 2008)); Hart v. Equitable Life Assur. Soc., 75 F. App'x 51 (2d Cir. 2003) (same). The absence of any discussion of Section 204(h) in such cases reinforces the Court's view that Section 204(h) notice was unnecessary before the Fund corrected Mr. Sydney's pension records in March 2013.[9]

---

[9] In support of the argument that the Fund was required to give Section 204(h) notice to Mr. Sydney before correcting his pension records in March 2013, Plaintiffs cite a letter from September 13, 2010, to Fund participants, stating that work for certain employers would not constitute Covered Employment by the Fund, as those employers were chronically delinquent and the Fund would stop considering them Contributing Employers as of October 1, 2010. Doc. 55 at 11 (discussing AR at 3509-10). Assuming the Court can even consider the letter – Defendant claims it does not belong in the AR, Doc. 50 at 12-13 – it is inapposite to this case. The Fund's written procedures for collecting contributions "authorize[d]," but did not require, the Fund to terminate delinquent employers. AR at 3377. Thus, the Fund had discretion as to whether to terminate employers, and needed to give Fund participants notice under Section 204(h) if they would stop receiving pension credits due to an exercise of that discretion. Conversely, the Plan Document's plain language gave the Fund no discretion in applying Section 1.13(d). Because Plaintiffs had notice of Section 1.13(d)'s automatic consequences for delinquency – through the Plan Document, the Fund's August 5, 2002, letter; the 2008 Summary Plan Description; and delinquency letters from July 2010 through August 2014 – the Fund did not need to provide notice under Section 204(h) notice when SSM became delinquent in 2006 or when the Fund corrected its records in March 2013.

E.    Whether Mr. Sydney is Entitled to Relief Under Section 502(a)(3)

Plaintiffs argue that if the Court does not award Mr. Sydney "the pension credits to which he would have been entitled without regard to the retroactive application of Section 1.13(d), he is entitled to the same relief through the equitable reformation remedy available under ERISA § 502(a)(3) for the . . . Fund's inequitable conduct."  Doc. 55 at 22.  Plaintiffs argue that equitable reformation is appropriate because the Fund:  (1) issued annual statements which misled Mr. Sydney to believe that he was accruing pension credits; (2) "failed to explain in any communications that Section 1.13(d) would 'automatically' freeze the pension credits of an Owner-Member whose contributing employer was late, even if the contributions were paid[,] and that the freeze on pension credits would continue indefinitely if the contributions were late even one day per year"; (3) "coerced [SSM] through collection litigation to make contributions to the [Fund] on behalf of Mr. Sydney, without disclosing that Mr. Sydney would not receive any pension credits for such untimely contributions"; and (4) failed to provide any Section 204(h) notices after SSM made untimely contributions.  Id. at 23.  The Court rejects Plaintiffs' argument.

Section 502(a)(3) authorizes a plan participate to bring a civil action to obtain "appropriate equitable relief" to redress a violation of ERISA or to "enforce any provisions of [ERISA] or the terms of the plan."  Mertens, 508 U.S. at 253.  "Appropriate equitable relief" can include the reformation of the terms of an ERISA plan, in order to remedy "false or misleading information" provided to a plan participant and to "prevent fraud."  CIGNA Corp. v. Amara, 563 U.S. 421, 440 (2011) (citations omitted).  Courts typically agree to reform an ERISA plan where there is strong evidence that the plan's language does not reflect the parties' reasonable expectations when they agreed to the plan.  See Young v. Verizon's Bell Atlantic Cash Balance

Plan, 615 F.3d 808, 818-20 (7th Cir. 2010) (discussing ERISA reformation cases from various circuits). Here, Plaintiffs present no evidence that they, the Fund, or Local 17 reasonably expected that Section 1.13(d) would be applied discretionarily, contrary to its plain language. Thus, the Court has no basis to reform the terms of Section 1.13(d) of the Plan Document.

Mr. Sydney complains that the Fund "continuously led Mr. Sydney to believe he was accruing additional pension credits based on the contributions made on his behalf after April 30, 2006 by providing him annual Pension Credit statements." This complaint is essentially a claim of equitable estoppel. The First Circuit has not yet decided whether to recognize equitable estoppel claims under Section 502(a)(3). Guerra-Delgado v. Popular, Inc., 774 F.3d 776, 782 (1st Cir. 2014). However, it has "assumed that any such claim" is limited to instances where the claimant reasonably relied on an incorrect statement by a second party interpreting an "'ambiguous'" plan term. Id. at 782-83 (explaining that ambiguity exists if "the terms are inconsistent on their face or the language can support reasonable differences of opinion as to [its] meaning") (quoting Livick, 524 F.3d at 31). Consistent with that assumption, the Court has strongly suggested that a plan's accidental issuance of erroneous pension statements does not obligate the plan to provide pension benefits in accordance with those statements, where the statements contradicted unambiguous plan terms. See Livick, 524 F.3d at 32 & n.8 (discussing, with approval, three cases from other circuit courts in which a claimant claimed reliance on incorrect pension benefit statements but the Court found no entitlement to the stated benefits); see also Tetreault v. Reliance Standard Life Ins. Co., 769 F.3d 49, 58 (1st Cir. 2014) (noting that "[t]he law does not . . . countenance reliance on one of a pair of contradictories simply because it facilitates the achievement of one's goal").

In Livick, the Court denied the plaintiff's Section 502(a)(3) equitable estoppel claim, which was based on "erroneous benefit estimates," where those estimates (1) contradicted unambiguous plan terms; (2) contained a disclaimer that the terms of the plan "trumped any estimates"; and (3) were clearly labeled as "estimates." 524 F.3d at 32. The Court recognizes that Mr. Sydney's statements did not contain a disclaimer that the terms of the Plan Document trumped them. See AR at 3467-69. The Court also recognizes that the statements said Mr. Sydney "ha[d] earned" a certain number of months of pension credit, not that he was *estimated* to have earned those months of credit; the only figure Mr. Sydney's statements say are "[e]stimated" are the *amount* of his monthly benefit. Id. at 3467-68. Nevertheless, the Court finds Mr. Sydney has not presented a viable equitable estoppel claim for three reasons, any one of which is sufficient on its own. First, the annual statements contradicted the unambiguous terms of Section 1.13(d). See Livick, 524 F.3d at 32. Second, the Fund advised plan participants, in a letter that apparently accompanied each statement, to "check [the] statement carefully," implying that the annual statements could contain errors. AR at 3469; see Livick, 524 F.3d at 32. Third, there is reason to believe that the statements are incorrect because SSM reported Mr. Sydney's hours incorrectly; the letter that apparently accompanied each annual statement told participants that the statements were based on hours reported to the Fund on the plan participant's behalf by the participant's employer, and that the hours on the statement should be correct unless "the hours were reported incorrectly."[10] AR at 3469.

With respect to Plaintiffs' other arguments for equitable reformation under Section 502(a)(3), Plaintiffs are simply incorrect that the Fund "failed to explain in any communications

---

[10] The Court does not conclude with any certainty that SSM reported hours incorrectly, and reiterates that any one of the three reasons it has given is sufficient to find that Mr. Sydney has not presented a viable equitable estoppel claim.

that Section 1.13(d) would 'automatically' freeze the pension credits of an Owner-Member whose contributing employer was late." Doc. 55 at 23. The Fund explained as much in an August 5, 2002, letter to SSM; in its 2008 Summary Plan Description; and in a series of delinquency letters from July 2010 through August . <u>See</u> Doc. 50 at 14, 52; AR at 594-643. Plaintiffs are also incorrect in stating that the Fun "coerced" SSM into making contributions to the Fund through collection litigation, and in suggesting that the Fund had any obligation in that litigation to remind Mr. Sydney that he "would not receive any pension credits for such untimely contributions." Doc. 55 at 23. Finally, as the Court has already explained, the Fund was not required to provide Section 204(h) notices before correcting Mr. Sydney's pension records in March 2013. <u>See</u> Section II.D.


III.    <u>COUNT TWO:  SSM'S DEMAND FOR REFUND OF CONTRIBUTIONS</u>

Plaintiffs argue that if Mr. Sydney is not entitled to the pension credits he demands in Count One, the Court should find that the Contributions Committee abused its discretion in denying SSM a refund of contributions that it mistakenly made on Mr. Sydney's behalf after April 30, 2006. Doc. 55 at 23; <u>see also</u> <u>supra</u> Section I.H (summarizing SSM's request for a refund and the Contributions Committee's denial of that request). More specifically, Plaintiffs contend that "the Contributions Committee abused its discretion in (1) finding that 'there was no mistake of fact or law' that would warrant a contribution refund; and (2) distinguishing other cases in which the Fund had offered and/or made contribution refunds." Doc. 55 at 25. The Court rejects both of these contentions.

The bases for Plaintiffs' first contention are unclear, but appear to include that (1) the CBAs SSM entered into with Local 17 "did not state explicitly that an Owner-Member would

not be accruing benefits under the Fund if the employer became delinquent"; (2) the Fund issued annual pension credit statements indicating that Mr. Sydney was earning credits, "despite any late contributions"; (3) the portions of the Local 17 CBAs relating to Fund-contribution obligations "pre-dated Section 1.13(d) and refer to the Registration Requirement," thus making it reasonable for SSM to "assume that late contributions could be retroactively cured – just as [SSM] cured the late Registration Statement late filing in 2003 which retroactively granted Mr. Sydney pension credits" from August 2001 till January 1, 2002 (at which point Owner-Members no longer needed to file a Registration Statement with the Fund); and (4) "[t]here is no evidence that Section 1.13(d) applied 'automatically' as the Fund now claims." Id. at 26-28 (citations omitted). Each of these claims is either incorrect or, if accurate, does not convince the Court that the Contributions Committee abused its discretion in finding that there was no mistake of fact or law on the part of SSM.

"[A]n employer may pursue a federal common law action for restitution to recover overpayments mistakenly made to an ERISA fund." State Street Bank and Trust Co. v. Denman Tire Corp., 240 F.3d 83, 89 (1st Cir. 2001). However, restitution "will not follow upon a mere showing that a plaintiff has tendered more than required, but only when the equities favor it." Kwatcher v. Massachusetts Serv. Employees Pension Fund, 879 F.2d 957, 967 (1st Cir. 1989), abrogated on other grounds by Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1 (2004). "The trial court should consider whatever factors it may reasonably believe shed light on the fairness of reimbursement, and weigh those factors against the backdrop of general equitable considerations and the guiding principles and purposes of ERISA." Id. In determining whether the equities favor an award of restitution for overpayments to an ERISA fund, this Court has considered whether the overpayment was "due to a mistake of law or fact"

and whether restitution would support ERISA's "fundamental policy" of preserving "funds for providing benefits to the plan participants." Malden Mills Industries, Inc. v. ILGWU Nat. Retirement Fund, 766 F. Supp. 1202, 1216-17 (D. Mass. 1991) (citation omitted); see also Kwatcher, 879 F.2d at 967 ("The impact of restitution on a plan's financial stability may certainly be considered."). Courts have also considered whether the defendant engaged in "wrongdoing," such as by concealing information from the plaintiff. Metropolitan Life Ins. Co. v. Socia, 16 F. Supp. 2d 66, 73 (D. Mass. 1998).

Here, restitution for SSM is inappropriate because there is insufficient evidence that SSM "tendered more than required," let alone that it did so due to a mistake of fact or that the equities favor restitution. Kwatcher, 879 F.2d at 967. Contrary to Plaintiffs' claim, the CBAs SSM entered into with Local 17 stated that an Owner-Member would not accrue benefits if his employer became delinquent. Doc. 50 at 39-40; see also Doc. 21-2 at 25. In addition, contrary to Plaintiffs' claim, Section 1.13(d) operated automatically. See supra Section II.B. As for Plaintiffs' complaint that SSM should have been able to "retroactively cure[]" its "late contributions" in the same way that it was able to retroactively register Mr. Sydney as an Owner-Member for the period preceding January 1, 2002, Plaintiffs offer no argument – and the Court cannot think of a convincing one on its own – for why SSM's ability to retroactively cure one failure should have enabled the company to retroactively cure another. Indeed, Plaintiffs admit that the Registration Statement requirement, "which . . . allowed retroactive cure," is "not at issue in this action."[11] Doc. 50 at 41.

---

[11] For the same reason, the Court rejects Plaintiffs' second main contention in support of its argument for restitution, i.e., that the Contributions Committee abused its discretion in distinguishing various refund offers the Fund made to other persons/entities from SSM's refund request. See Doc. 55 at 30-31. The other refund offers were for contributions made before January 1, 2002, on behalf of purported owner-members who had failed to file Owner-Member Registration Statements, as the Fund required owner-members to file before that date. See AR at 3413-417; Doc. 50 at 34-35. Because the Registration Statement requirement is "not at issue in this action," Doc. 50 at 41, those refund offers are not relevant to SSM's demand for a refund.

The Court acknowledges that there was a mistake of fact: the Fund issued incorrect annual statements that Mr. Sydney was accruing pension credits which he was not. However, there is scant evidence that SSM continued to contribute to the Fund *due to* that mistake of fact. For one thing, the only evidence that Mr. Sydney was an Owner-Member simply so he could participate in the Fund's retirement plan is his statement to that effect in a September 2014 letter to the Fund's Appeals Committee. Id. at 5 (citing AR at 16). Such evidence is insufficient for the Court to conclude that SSM contributed to the Fund solely because of the mistake fact in this case. Moreover, SSM's claim of mistake of fact based upon the incorrect annual pension statements amounts to an equitable estoppel claim, which the Court rejects for the same reasons it rejected Mr. Sydney's equitable estoppel claim based on those statements, namely that (1) the statements contradicted the plain language of Section 1.13(d); (2) a letter that apparently accompanied each statement instructed plan participants to check the statements for errors; and (3) there is reason to believe that the statements are incorrect because SSM reported Mr. Sydney's hours incorrectly. See supra Section II.E. In addition, notwithstanding the incorrect annual statements, it is even plausible that Mr. Sydney knew he was not accruing pension credits but SSM continued to contribute because (1) SSM's CBA with Local 17 required contributions to the Fund, see AR at 570, and SSM obtained benefits from the CBA besides participation in the Fund, like perhaps employment opportunities; and/or (2) Mr. Sydney hoped or expected that at some point SSM would cure its delinquent status with a full year of timely contributions to the Fund, per Section 1.13(d) of the Plan Document, and he would begin accruing pension credits again. See Doc. 57 at 16. Therefore, the Court has insufficient reason to conclude that SSM "overcontributed" to the Fund due to the incorrect annual pension credit statements. The Court thus finds that the Contributions Committee did not abuse its discretion in finding no mistake of

law or fact, and further finds that the equities in this case do not favor a refund of any of SSM's contributions to the Fund.[12]

IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Court ALLOWS Defendant's Motion for Summary Judgment (Doc. 52) and DENIES Plaintiffs' Motion for Summary Judgment (Doc. 54).

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[12] Because the Court finds that Defendant is entitled to summary judgment on Counts One and Two of Plaintiffs' Amended Complaint, it need not address Count Three (for attorney's costs and fees).